Garry, J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered December 7, 2011, upon a verdict convicting defendant of the crimes of conspiracy in the second degree, intimidating a victim or witness in the first degree, tampering with a witness in the first degree and criminal facilitation in the second degree.
In January 2010, the victim testified before an Ulster County grand jury regarding a shooting that he had witnessed involving codefendant Jarrin Rankin, a gang member. Following Rankin’s arrest, defendant—a self-admitted gang member—and other gang members and associates close to Rankin began to search for potential witnesses. At Rankin’s February 2010 arraignment, he discovered that the victim was going to testify against him. A week later, defendant called codefendant Amanda Miller asking to speak with Rankin’s brother, codefendant Trevor Mattis, and ostensibly indicated to Mattis that the victim was at a deli in the City of Kingston, Ulster County. Miller then drove Mattis and codefendants Gary Griffin and Dametria Kelley to the deli. Upon arrival, Griffin provided Mattis with a gun, and the duo met defendant and the victim in front of the deli. Mattis and the victim then walked away from the deli; defendant and Griffin went to Miller’s vehicle. Shortly thereafter, Mattis fatally shot the victim, returned to Miller’s vehicle and fled the scene. Defendant, Mattis, Rankin, Miller, Griffin, Kelley and an *1184 other codefendant, Rondy Russ, were subsequently charged by superseding indictment with various crimes stemming from their role in the victim’s death.[1]
County Court, upon defendant’s motion, severed defendant’s trial from that of his codefendants. The court also denied defendant’s motion to suppress statements that he made following his arrest based upon an alleged Payton violation (see Payton v New York, 445 US 573, 576 [1980]). A jury subsequently found defendant guilty of the crimes of conspiracy in the second degree, intimidating a victim or witness in the first degree, tampering with a witness in the first degree and criminal facilitation in the second degree. Defendant was sentenced, as a second felony offender, to concurrent terms, the longest of which was 25 years in prison, and five years of postrelease supervision. Defendant appeals, and we affirm.
Defendant first contends that County Court erred in admitting hearsay statements by his alleged coconspirators.[2] Where, as here, the People seek to elicit declarations made by a coconspirator, a prima facie case of conspiracy must be established before such declarations may be admitted. This requires proof “of an agreement to commit a crime and an overt act towards carrying out that agreement” (People v Cancer, 16 AD3d 835, 839 [2005], lv denied 5 NY3d 826 [2005]; see People v Caban, 5 NY3d 143, 148-149 [2005]; People v Bac Tran, 80 NY2d 170, 179 [1992]; People v Berkowitz, 50 NY2d 333, 341 [1980]).[3] Here, the People proffered nonhearsay testimony at trial establishing that the individuals involved in this case were either members of the same gang as Rankin or were associated with Rankin, and that they frequently gathered at defendant’s apartment. In January 2010, Russ threatened the victim’s father with a razor or box cutter outside of the deli. Rankin was arraigned in February 2010 and, at that time, the People provided him with a witness list that included the victim’s name. Four days later, a party was held at defendant’s apartment during *1185 which Rankin called and spoke with both defendant and Mattis, among others.
On the evening of February 9, 2010, Miller was at Griffin’s home when defendant called and spoke to Mattis. After the call ended, she drove Griffin, Mattis and Kelley to the deli. Upon arrival, she observed defendant and the victim standing in the doorway of the deli. Mattis exited the vehicle, at which point Griffin “slid [a] gun out” to him through the right rear window. Surveillance video from the deli captured defendant conversing with the victim prior to the arrival of Mattis and Griffin. The video also captured the victim and Mattis walking away from the deli as defendant and Griffin returned to Miller’s vehicle. When defendant entered the rear of the vehicle, he “slid over into the middle” seat. Upon Griffin’s request, Miller made a U-turn and parked a few car lengths from Mattis and the victim, at which point she heard two gun shots and then observed Mattis running to her vehicle and defendant opening the rear door for Mattis to enter. The proof showed that the victim was shot twice, including a fatal shot to the back of the head. Based on the foregoing evidence, we conclude that the People established a prima facie case of conspiracy through the nonhearsay testimony of other witnesses and participants, thus permitting the People to introduce the statements of defendant’s coconspirators (see People v Caban, 5 NY3d at 148; People v Cancer, 16 AD3d at 839; compare People v Conklin, 139 AD2d 156, 162 [1988], lv denied 72 NY2d 1044 [1988]).
Defendant’s challenges to the legal sufficiency of the evidence supporting his convictions for tampering with a witness in the first degree and criminal facilitation in the second degree are unpreserved for our review; although he moved for a trial order of dismissal, he failed to identify any deficiency in the People’s proof as to those charges (see People v Hawkins, 11 NY3d 484, 492 [2008]; People v Gray, 86 NY2d 10, 19 [1995]; People v Greenfield, 112 AD3d 1226, 1226 [2013]). In any event, were we to consider these challenges, we would find the evidence legally sufficient to lead a rational juror to conclude that all the essential elements of each crime were proved beyond a reasonable doubt (see Penal Law §§ 115.05, 215.13 [2]; People v Danielson, 9 NY3d 342, 349 [2007]).
As to defendant’s challenge to the legal sufficiency of his conviction of conspiracy in the second degree, the People were required to prove that defendant entered into an agreement with his coconspirators to murder the victim and that, in furtherance of the conspiracy, Mattis killed the victim (see Penal Law §§ 105.15, 105.20; People v Arroyo, 93 NY2d 990, 991 *1186 [1999]; People v McCoy, 89 AD3d 1218, 1221 [2011], lv denied 18 NY3d 960 [2012]). Upon the charge of intimidating a victim or witness in the first degree, the People were required to adduce proof that defendant intentionally aided Mattis in causing the victim serious physical injury for the purpose of preventing him from cooperating with law enforcement or any court (see Penal Law §§ 20.00, 215.17 [1]). In addition to the testimony set forth above, the People adduced proof that, following Rankin’s arrest in November 2009, Rankin suspected that either the victim or Lee Gray, the victim’s close friend, was cooperating with the police. A recorded telephone call that Rankin made from the Ulster County jail at the end of November 2009 indicated that defendant had been tasked with “talk[ing] to” Gray to ascertain whether he was cooperating with the police. In December 2009, Rankin directed Russ to “stay on top” of the situation, making oblique reference to Gray and the victim. In January 2010, Russ questioned the victim’s father about the victim’s whereabouts; when the father failed to disclose the victim’s location, he threatened to “kill his whole family.” Kelley subsequently informed Rankin that she was discussing the matter with defendant, among others, and that “[n]obody kn[ew]” where the victim was located. Kelley disclosed to Rankin, however, that she had learned that the victim had written “a statement against [Rankin].” The next day, Rankin instructed Kelley to tell Russ that he needed to ensure that the victim “don’t resurface.” Suspecting that the victim was hiding out in the Village of Lake George, Warren County, Mattis told Rankin that he was going to Lake George and that “everything [was] under control.”
The People adduced further proof that, although Miller did not overhear the telephone conversation between defendant and Mattis on the evening of the incident, after Mattis ended the phone call, he instructed Miller to “drive to [the] Cedar Street store ASAP” Miller testified that she, Mattis and Kelley went out to her vehicle and, when Griffin entered the vehicle, he stated that he “brought the hammer,” i.e., the gun. Although Miller and Kelley each testified that no one had ever previously mentioned shooting or killing the victim, viewing the proof in the light most favorable to the People (see People v Kancharla, 23 NY3d 294, 302-303 [2014]; People v Reed, 22 NY3d 530, 534 [2014]), we find that there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of conspiracy in the second degree (see People v Booker, 53 AD3d 697, 703 [2008], lv denied 11 NY3d 853 [2008]; People v Ballard, 38 AD3d 1001, 1003 [2007], lv denied 9 NY3d 840 [2007]) and intimidating a victim or witness *1187 in the first degree proved beyond a reasonable doubt (see Penal Law §§ 20.00, 215.17 [1]; cf. People v Degiorgio, 36 AD3d 1007, 1008 [2007], lv denied 8 NY3d 921 [2007], cert denied 552 US 999 [2007]; People v Lyons, 4 AD3d 549, 552-553 [2004]).
Defendant further contends that the police lacked probable cause to arrest him and that he was subject to an illegal warrantless arrest in his home. A warrantless entry into an individual’s home for the purposes of making an arrest is “ ‘presumptively unreasonable’ ” (People v Molnar, 98 NY2d 328, 331 [2002], quoting Payton v New York, 445 US at 586; accord, People v McBride, 14 NY3d 440, 445 [2010], cert denied 562 US —, 131 S Ct 327 [2010]); absent exigent circumstances or consent, the police are prohibited from entering an individual’s home for such purpose (see People v Levan, 62 NY2d 139, 142 [1984]; People v Daly, 180 AD2d 872, 873 [1992], lv denied 79 NY2d 1048 [1992]). However, it is also well settled that a third party with ostensible authority may grant consent to the entry (see People v Read, 74 AD3d 1245, 1246 [2010]; People v Faulkner, 36 AD3d 1071, 1072 [2007]; People v Daly, 180 AD2d at 874). Evidence at the suppression hearing established that, prior to defendant’s arrest, Mattis had confessed to killing the victim, the police had identified defendant as one of the individuals who was with the victim and Mattis just prior to the shooting, and Miller had informed the police about the circumstances precipitating the victim’s death. This evidence amply supports County Court’s conclusion that the police had probable cause to arrest defendant (see generally People v Maldonado, 86 NY2d 631, 635 [1995]; People v Stroman, 106 AD3d 1268, 1269 [2013], lv denied 21 NY3d 1046 [2013]). After gathering this information, the police went to locate defendant at an apartment where a codefendant had told them defendant could be found. Robert Henry, a detective with the Kingston Police Department, testified that, upon receiving no response from that apartment, he knocked on the door of the adjoining apartment. Tenant Kellyann Sanchez opened the door. Henry identified himself and the others as police officers, and stated that they were looking for defendant. Sanchez told them that defendant was upstairs sleeping. Henry testified that he then asked to speak with him. She responded by taking a step back, raising her hands in the air with palms facing forward, stating “do whatever you need to do” and stepping away from the front door, thus allowing the officers to enter. Sanchez testified at the suppression hearing that she did not provide consent for the police to enter; County Court found that Sanchez’s account was not credible and, instead, credited Henry’s version of the events. *1188 According appropriate deference to those credibility determinations (see People v Prochilo, 41 NY2d 759, 761 [1977]), we find that County Court properly determined that Sanchez consented to the officers’ entry (see People v Sigl, 107 AD3d 1585, 1587 [2013], lv denied 21 NY3d 1077 [2013]; People v Nelson, 292 AD2d 397, 397-398 [2002]; People v Washington, 209 AD2d 817, 819 [1994], lv denied 85 NY2d 944 [1995]).[4]
Peters, EJ., Stein, Egan Jr. and Clark, JJ., concur.
Ordered that the judgment is affirmed.

. Mattis’s conviction for, among other things, murder in the first degree, for which he was sentenced to a prison term of life without parole, was affirmed by this Court (People v Mattis, 108 AD3d 872 [2013], lv denied 22 NY3d 957 [2013]). Rankin’s conviction for conspiracy in the second degree, for which he was sentenced to a prison term of 12V2 to 25 years, was also affirmed by this Court (People v Rankin, 117 AD3d 1231 [2014]). The appeal on behalf of Griffin, who was convicted of, among other things, murder in the first degree and conspiracy in the second degree, is currently pending.

. This argument was properly preserved by a motion in limine and appropriate objections at trial.

. To the extent that People v Rossney (178 AD2d 765, 766-767 [1991], lv denied 79 NY2d 1007 [1992]) held otherwise, it is overruled.

. Defendant argues that there were no exigent circumstances justifying the warrantless entry, but County Court found that the roommate had consented; the People did not need to establish both (see People v Gardner, 45 AD3d 1371, 1371 [2007], lv denied 9 NY3d 1033 [2008]; People v Daly, 180 AD2d at 873-874).